MICHAEL M. RAUHUT *v.* MURIEL H. SHORT, ADMINISTRATRIX (ESTATE OF HARRIET H. FOGARTY)

SUPERIOR COURT     NEW HAVEN COUNTY     FILE NO. 105607
AT NEW HAVEN

Memorandum filed May 10, 1965

*John C. Macrides* and *Donald F. Zezima,* of Stamford, for the plaintiff.

*Max H. Schwartz, Stanley H. Burdick* and *Albert D. Saunders, Jr.,* of New Haven, for the defendant.

I

FITZGERALD, J.  Harriet H. Fogarty, domiciled in Connecticut, died intestate at New Haven on March 27, 1963, leaving a substantial estate consisting entirely of personal property located in Connecticut. The estate, on which the defendant is administratrix, is presently in the process of final settlement

and distribution in the Probate Court for the district of New Haven. The within proceeding is an appeal by the plaintiff from the decree of the Probate Court entered on September 18, 1964, accepting the administration account of the defendant and ordering distribution of one-half of the net estate to William E. McKay and the other one-half to Muriel Short, a brother and niece of the intestate, upon a finding that they are her sole heirs at law and sole distributees of the estate.

The intestate was not survived by a husband, children or children of any predeceased child or children of her own. Her closest surviving relatives of the full blood are her brother William E. McKay, her niece Muriel Short, who is the only child of her predeceased brother John McKay, and the plaintiff, Michael McKay Rauhut, the only child of her predeceased brother Harry R. McKay.

In his reasons of appeal, the plaintiff claims error by the Probate Court in not including him as an heir at law of the intestate and as a third distributee of the estate, because his predeceased father, Harry R. McKay, was a brother of the intestate, thereby conferring upon him a degree of kinship to her, for purposes of distribution, equal to that of William E. McKay and Muriel Short. By way of a special defense, which has been put in issue, the defendant administratrix pleads as follows: "The plaintiff had been adopted long prior to the death of the defendant's decedent, and is, therefore, not an heir-at-law entitled to a distributive share of the decedent's estate."

## II

The following additional facts are either conceded by the parties or find sufficient support in the evidence as a whole, documentary or otherwise:

The plaintiff was born in the state of New York on December 4, 1930, the sole issue of the marriage of the aforesaid Harry R. McKay to Charlotte P. McKay. On July 22, 1935, the plaintiff's mother secured a decree of divorce from his father in the Second Judicial District Court of the state of Nevada, a court of record having common-law jurisdiction, on the ground that his father, for more than one year last past, had neglected to provide her with the common necessaries of life. His father appeared by counsel but did not contest. Sole custody of the plaintiff, who was then under five years of age, was awarded to his mother. Neither right of visitation in the father in regard to the plaintiff, support of the plaintiff, nor alimony to his mother was made a part of that decree.

On September 19, 1935, the plaintiff's mother married Hugh August Rauhut in Nevada. On November 28, 1938, when the plaintiff was a week under eight years of age, the same court in Nevada which had previously granted the decree of divorce to the plaintiff's mother granted the petition of Rauhut for leave to adopt the plaintiff. The plaintiff's mother, who was then the wife of the petitioner, gave her written consent to the adoption. The petition alleges, among other things, the earlier decree of divorce in favor of the plaintiff's mother and the awarding of sole custody therein of the plaintiff to his mother, "and that there are no [other] relatives of said child residing [in the state of Nevada], whose consent is required or upon whom notice should be given." It is further alleged in the petition that the plaintiff's father had not contributed to his support since February, 1934. In granting the petition for adoption, the court found the allegations of the petition "fully proved" and that the adoption was "for the best interest of" the plaintiff. The entry of order and decree reads:

"[I]n accordance with the statutes in such cases made and provided that from this date, the said child shall to all legal intents and purposes, be the child of the Petitioner, HUGH AUGUST RAUHUT, and for the purposes of inheritance and all other legal incidents and consequences, shall be the same as if he had been born to them (viz. petitioner and plaintiff's mother) in lawful wedlock; and that the name of such child be changed to MICHAEL McKAY RAUHUT, according to the prayer of the Petitioner herein."

In April, 1941, the plaintiff's mother obtained a decree of divorce in Nevada from Rauhut. Both she and Rauhut are alive and continue to reside in that state. On June 29, 1947, the plaintiff's natural father, Harry R. McKay, died without leaving any known estate. The court has not been informed as to his residence at the time of his death. Presumably, it was in a state other than Nevada. In early September, 1952, the plaintiff, who was then some three months under twenty-two years of age and had been residing with his mother in Reno, Nevada, left that state to pursue graduate studies in chemistry at the University of North Carolina. It was his intention never to return to live in Nevada on a permanent basis because the field of research work in chemistry in which he was interested is elsewhere in this country. Other than an occasional holiday visit to his mother, he has not lived in Nevada since 1952. Upon receiving a doctorate degree at the University of North Carolina, the plaintiff became a legal resident of Connecticut in 1955; he first resided in Stamford and presently resides in Norwalk. His occupation is that of a chemist engaged in research.

Neither the plaintiff's natural father in his lifetime nor the plaintiff himself, after attaining his

majority, ever sought to challenge the validity and legality of the Nevada adoption proceeding had on November 28, 1938. At the hearing on this appeal, the plaintiff's counsel stated in effect that his client is not to be understood as suggesting any irregularity in that proceeding, but places the defendant administratrix on her proof as to its validity and legality by reason of her interposed special defense, quoted in the third paragraph, part 1, of this memorandum. In his reply thereto, the plaintiff denied the allegations of that special defense.

## III

In addition to being a court of record, as already noted, the Second Judicial District Court of the state of Nevada, wherein the order and decree of adoption relating to the plaintiff was entered on November 28, 1938, is found to occupy the status of a court of general jurisdiction. Over a quarter of a century has passed since the entry of that order and decree, during which time its validity and legality have never been challenged by anyone through the medium of direct or collateral attack on any ground whatsoever. The defendant by her special defense does not do so. All that the special defense is designed to accomplish is to call attention to the existence of the order and decree of adoption, entered in a court of record and of general jurisdiction, in connection with the claimed status of the plaintiff as an heir at law of the intestate and as a distributee of her estate.

The precise question on this aspect is whether it sufficiently appears that the Nevada court lacked jurisdiction to enter a valid and legal order and decree of adoption on November 28, 1938, because it does not expressly appear from the record brought before this court that the plaintiff's natural father gave consent to the adoption or was given

notice of the proceeding. Section 9481 of the Nevada Compiled Laws (1929), as certified by the secretary of state of Nevada, and referred to by the Supreme Court of Nevada in *In re Asterbloom's Adoption,* 63 Nev. 190, 195, was effective in 1938 at the time of the adoption proceeding. It reads in essential part: "If the persons whose consent is necessary to the adoption of the child are not within this state, their consent, in writing, if they be known and their whereabouts can be ascertained, must be obtained and filed with the judge, . . . *provided,* that if the judge shall find that the person or persons whose consent is required have abandoned such child, or if such persons are unknown, or their whereabouts cannot be ascertained, then in that case the judge may, in his discretion, proceed to make the order of adoption without such consent; but in that case it shall be the duty of the judge to cause to appear before him, by citation or otherwise, the persons in whose custody the child is, and may also bring before him, in his discretion, such of the next friends of the child as he may deem proper, and shall examine them under oath, and if he deem it for the best interests of the child, he shall make the order of adoption."

Matters recited in part II of this memorandum need not be restated other than to say that the plaintiff testified in this court that he was present at the adoption proceeding, that his natural father was not present, and that the last time he had seen him was in 1934, before the divorce of his parents. While it must be conceded that the adoption record presented to this court is silent as to any written consent of the plaintiff's natural father, the overwhelming implication is that he did not so consent in writing and that his whereabouts outside of Nevada were not then ascertainable, and that the presiding judge otherwise followed the provisions of the statute which relate to those contingencies. So also aban-

donment of the plaintiff by his natural father could be spelled out by strong implication commencing a year before the divorce decree in 1935.

"The absence from the record of the necessary jurisdictional facts will not overcome the presumption of jurisdiction, and that papers which ought to have been included in the judgment-roll are missing therefrom is not enough to make it affirmatively appear that the court had no jurisdiction. In the absence, therefore, of any showing in the record either one way or the other, a presumption arises in favor of the validity of the judgment of a court of general jurisdiction, and the existence of all matters going to the power of the court or tribunal to render the judgment." 1 Freeman, Judgments (5th Ed.) p. 820. Reference is also made to 30A Am. Jur., Judgments, §§ 34, 38; *Sanford* v. *Sanford,* 28 Conn. 5, 15; *Coit* v. *Haven,* 30 Conn. 190, 197-200.

To go no further, the order and decree of adoption entered by the Nevada court on November 28, 1938, should be, and is, presumed to be valid and legal. Hence the status of the plaintiff is that of a legally adopted son of Hugh August Rauhut, and it is so found. It still remains to be determined what effect this finding has in connection with his claimed status as an heir at law of the intestate, a sister of his predeceased natural father, and as a third distributee of her estate.

### IV

At the time of the adoption proceeding in Nevada in 1938, a statute of that state provided that an adopted child could inherit from his adoptive parents but was silent as to whether such adopted child could continue to inherit from his natural parents or kindred. In 1953, the Nevada legislature enacted a new statute in greater detail. See Nev. Rev. Stat. § 127.160 (1958). This statute includes the provi-

sion of inheritance by an adopted child "from his adoptive parents or their relatives" and the following additional provision: "The [adopted] child shall not owe his natural parents or their relatives any legal duty nor shall he inherit from his natural parents or kindred."

In the absence of the plaintiff's status of an adopted child of Rauhut by order and decree of the Nevada court on November 28, 1938, he would be an heir at law of the intestate and a third distributee of her estate. Conn. General Statutes § 45-276. This statute has been carried in the last several revisions of the General Statutes. In Connecticut, the right of inheritance of an adopted child from its adopting parents or their relatives and the denial of such inheritance from its natural parents or relatives stem from an act of the General Assembly adopted in 1885 (Public Acts 1885, c. 110, § 66), referred to by Chief Justice Maltbie in *Brooks Bank & Trust Co.* v. *Rorabacher,* 118 Conn. 202, 205 (1934).

The General Statutes of Connecticut, § 45-65, contains the following provision, among others: "The rights of inheritance by and from an adopted child shall be as hereinafter set forth and such rights shall become operative upon the entry of a final decree approving the adoption. An adopted child shall inherit estate from his adopting parent or parents or their relatives as though he were the natural child of such parent or parents and he shall not inherit estate from his natural parents or their relatives . . . ." The opening sentence of this statute was first contained in § 652g of the 1943 Supplement, in substitution of § 4810 of the Revision of 1930. Since there is no vested right of succession to intestate property until the death of the ancestor by the majority rule (16 Am. Jur., Descent and Distribu-

tion, § 14), the application of the opening sentence of the statute should not be accorded a retrospective effect dating back to the Nevada adoption order and decree of 1938, when the Nevada statute then in force was silent as to the rights of inheritance of an adopted child from his natural parents or kindred. This is because any right of inheritance that the plaintiff may assert as to property of the intestate subject to distribution in Connecticut is primarily controlled by the statutory law of Connecticut in effect at the death of the intestate in 1963. To paraphrase a part of the opinion in the *Brooks* case, supra, 209: The statute does not give to past acts a new effect upon mutual rights or liabilities. Nor does it change or affect existing rights. Rights by inheritance in an estate do not accrue until the death of the owner intestate. A law providing for the future descent of property is prospective.

## V

In 2 Am. Jur. 2d, Adoption, § 115, it is stated: "While it is well settled that the status of an adopted child is fixed by the law of the state of adoption, there is lack of unanimity in the decisions which deal with differences or conflicts between the state of adoption and the state where the right to inherit is asserted, governing the rights of adopted children in descent and distribution of intestate property. According to the better view and weight of authority the rights of inheritance of the child as an adopted child, and the extent of such right of inheritance, will be determined, not by the law of the state where the adoption took place, but in the case of real property by the law of the state where the property is located, and in the distribution of personal property by the law of the domicil of the intestate owner, at his death." This accords substantially with the view expressed in 2 C.J.S., Adoption of Children,

§ 66, and in 2 Beale, Conflict of Laws, p. 968. Cases from twenty-seven jurisdictions are listed as supporting this view, "expressly or by fair implication," by the annotator in 87 A.L.R.2d 1240, 1252, § 6 (b). We are here concerned solely with personal property, all of which is in Connecticut, the domiciliary state of the intestate.

The opinion of the Supreme Court of Pennsylvania in *Zoell's Estate*, 345 Pa. 413, cert. denied, 318 U.S. 778, is worth a specific reference. The question presented on appeal in that case was what were the rights of inheritance of a child, adopted in New Jersey, in the estate of a natural collateral relative, an uncle dying intestate, domiciled in Pennsylvania, whose entire estate was located in Pennsylvania, where the decree of adoption reserved certain inheritance rights to the adopted child. In affirming the rejection by the trial court of the claim of inheritance by the child adopted in New Jersey, the reviewing tribunal said (414-415): "We cannot accept . . . [her] contention, because the language of our statute expressly forbids her participation in the estate. We recognize her status, as an adopted child of her foster parents, but our Intestate Act says that she, like all other adopted children, cannot take anything from a natural collateral relative. A New Jersey decree, or a statute of that State, to which the decree gives effect, cannot alter our positive law. The full faith and credit clause of the Federal Constitution requires us to recognize only her status as adopted. What we are dealing with is a question of descent, not one of status. 'The state of the place of the property, in denying him the right to inherit, is not denying his status as an adopted child, nor even the incident of that status (for rights of inheritance as to property located in the state of adoption are still recognized), but is merely giving effect to its statute of inheritance

prescribing the class of persons who shall or shall not take property there located.' 73 A.L.R. 974. To which may be added, that that is the function, solely of the State of the domicile of the intestate or of the property's location. As to personal property, which is what is here involved, it follows the person of the owner and is distributable according to the intestate laws of his place of domicile. The Restatement, Conflict of Laws, Sec. 305(b), thus states the rule: 'If the law of the state of the decedent's domicil allows an adopted child to take a distributive share, a legally adopted child will take a share although the law of the state of adoption or of the state where a chattel is provides otherwise. If the law of the state of the decedent's domicil does not allow an adopted child to take a distributive share, he cannot do so, although the law of the state of adoption or of the state where a chattel is would allow him to take.' " As recently as 1963, the Pennsylvania court reaffirmed its position. See *Christoff Estate,* 411 Pa. 419. Reference is also made to the cogent statement of like effect by the Supreme Court of New Hampshire in *Anderson* v. *French,* 77 N.H. 509, 514-515, a much cited opinion in texts and authoritative sources of the law.

## VI

The plaintiff urges that a 1955 amendment (Cum. Sup. 1955, § 2905d) to what is now § 45-65 of the General Statutes in any event preserves his right of inheritance and constitutes him a third distributee of the estate of the intestate. This amendment reads: ". . . provided, when one of the parents of a minor child has died and the surviving parent has remarried, adoption of such child by the person with whom such remarriage is contracted shall not affect the rights of such child to inherit from the relatives of the deceased parent."

Patently, this amended provision has no application on the facts of the case. It could be otherwise only if the plaintiff's natural father had died and his mother, widowed by this circumstance, married Rauhut, followed thereafter by the adoption of the plaintiff by Rauhut. The plaintiff's natural father died after the adoption. His marriage to the plaintiff's mother was terminated earlier by divorce and not by his death. This amended provision of the statute avails the plaintiff nothing since it does not apply to the situation at bar.

## VII

*Slattery* v. *Hartford-Connecticut Trust Co.*, 115 Conn. 163 (1932), invoked by the plaintiff in support of his position, will now be considered. In that case the intestate died domiciled in Connecticut, leaving a considerable estate, consisting entirely of personal property. He was survived by a widow who had been his second wife, and a son of a first marriage which had terminated in divorce in Michigan, where the son was born. Custody of the son was awarded to his mother by the Michigan divorce decree. She remarried and the son was adopted in Michigan by the second husband. By the laws of Michigan under which the son was adopted, he would inherit from both his natural and his adopting parents. The then Connecticut statute (Rev. 1930, § 4810, predecessor in part to the present Connecticut statute, General Statutes § 45-65) excluded an adopted child from inheriting from his natural parents or their relatives. In permitting the sought inheritance of the adopted son to a distributive share of the estate of his intestate natural father, our Supreme Court emphasized (p. 167) that the right in the son, although adopted by his mother's second husband in Michigan, "would not be injurious to our public rights or violate our positive laws," adding, "Nor is it so opposed to any established

policy of our own that there is sufficient reason for us to refuse to recognize it."

It is deemed that the holding by our Supreme Court in the *Slattery* case, supra, is not controlling on the case at bar for the following reasons: (1) The relationship between the adopted son and the intestate in that case was that of natural son and natural father, and not that of a collateral natural kinship; (2) in 1953, the Nevada statute by amendment specifically excluded the right of inheritance by an adopted child from his natural parents or kindred, whereas the Michigan statute from the date of that adoption forward permitted that right; (3) at no time did the plaintiff at bar have a vested right of inheritance from his aunt, the intestate, through his predeceased natural father, until her death in 1963; (4) the holding of the Pennsylvania court in *Zoell's Estate,* supra, considered and quoted in part V of this memorandum, involving the claim of a niece adopted in New Jersey to a distributive share in the estate of her natural uncle, who died intestate in Pennsylvania, the state of his domicil, which the United States Supreme Court refused to disturb, by denying writ of certiorari, is much closer to the situation at bar than the *Slattery* case and should be followed by this court.

## VIII

In view of the foregoing, judgment may enter dismissing the appeal and affirming the decree of the Probate Court for the district of New Haven finding that William E. McKay and Muriel Short are the sole heirs at law of the intestate, Harriet H. Fogarty, and the sole distributees of the estate.

Counsel are complimented for their industry as reflected in the scholarly briefs they have filed.